UNITED STATES DISTRICT COURT                    **NOT FOR PUBLICATION**
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
NATIONAL ELEVATOR CAB & DOOR
CORP.,

                        Plaintiff,                  MEMORANDUM
                                                        <u>AND ORDER</u>

      -against-

                                                      07 CV 1562 (ERK) (RML)
H & B, INC.,

                        Defendant.
-----------------------------------------------------------X

LEVY, United States Magistrate Judge:

          By stipulation dated May 2, 2007, the parties consented to have this case referred

to a Magistrate Judge for the purpose of ruling on plaintiff's preliminary injunction motion.  <u>See</u>

28 U.S.C. § 636(c).  I conducted a preliminary injunction hearing on July 16-19, 2007.  (<u>See</u>

Transcript of Hearing, dated July 16-19, 2007 ("Tr.")).[1]  Presently before me is the motion of

defendant H&B Elevator, Inc. ("defendant" or "H&B") for reconsideration of my order, dated

July 20, 2007, granting the motion of plaintiff National Elevator Cab & Door Corp. ("plaintiff"

or "National") for a preliminary injunction.[2]  For the reasons stated below, defendant's motion is

denied.

**BACKGROUND AND ESTABLISHED FACTS**

          National is a New York corporation, with its principal place of business in

Woodside, New York.  (Complaint, dated Apr. 16, 2007 ("Compl."), ¶ 10.)  National is a

---

      [1] For the sake of clarity, all cites to the hearing transcript will contain the witness's name
and the date on which he or she testified.

      [2] Plaintiff's motion for sanctions will be addressed in a separate Memorandum and
Order.

supplier of elevator entrances and cabs for both new construction and modernization projects,

working almost exclusively in the New York metropolitan area. (Id. ¶ 10, 17; H. Friedman Tr.,

7/16/07, at 140.) H&B is a Minnesota corporation with its principal place of business in

Minneapolis, Minnesota. (Compl. ¶ 11.) H&B, which also manufactures and sells elevator cabs

and entrances, works nationally and internationally, including in Chicago, Las Vegas, and Dubai.

(See Weninger Tr., 7/19/07, at 5.)

      In October 2005, H&B, which had little presence in the New York City market,

expressed an interest in acquiring National. According to National, one reason the company was

attractive was that it had developed a unique and innovative type of elevator entrance, called

SecureSlide, which had doors and frames that could be installed entirely from the floor in the

building's hallway. At the hearing, the court viewed a DVD – which National created in 2004 –

describing the patented SecureSlide entrance and its advantages over other types of entrances,

namely that it offers substantial cost and time savings to builders and increased worker safety.

(See J. Freidman Tr., 7/17/07, at 287; H. Friedman Tr., 7/16/07, at 142-43.)[3] National's success

was also linked to the fact that it was the only major company in the New York market that

provided both elevator entrances and installation services, since it had a non-exclusive

arrangement with AM Erectors to conduct installations. (See J. Friedman Tr., 7/17/07, at 286-

---

    [3] As Harold Friedman explained, most elevator entrances are installed during the second phase of construction from a platform built inside the elevator shaft, which means "you must have electricity to the elevator shaft and you must have a running platform inside, the rails are set and . . . it is done from inside the platform going up one floor at a time." (H. Friedman Tr., 7/16/07, at 141.) By contrast, National's doors and frames are designed to be installed from the hallway, "in the first phase of the construction job," before the platform is built and electrified. The installation can therefore be timed to coincide with work being performed by the dry wall and mason contractors. (Id. at 142.)

87.)[4]  H&B, by contrast, had encountered difficulties entering the New York market.  According to notes taken by Kimberly Weninger, then H&B's Chief Operating Officer,[5] at a meeting at National's headquarters on October 14, 2005, H&B "was not making money on entrances," had "a poor design" for elevator entrances which had not been updated in about thirty years, was "not cost efficient," and was not competitive on pricing.  Weninger also noted that H&B had no patents relating to elevator entrances and, unlike National, did not offer installation services.  (See Trial Ex. 1; H. Friedman Tr., 7/16/07, at 149-53.)  At the hearing, Weninger testified that, as of January 2003, H&B was not making a profit and had not done so "for many years." (Weninger Tr., 7/19/07, at 82.)

              In connection with the parties' discussions concerning a possible acquisition, and in recognition of the fact that the two companies were competitors, National asked H&B to sign a written agreement (the "Agreement") confirming, *inter alia*, that if the acquisition did not occur, H&B would not: (1) solicit or conduct business with three specified National customers – Fujitec New York ("Fujitec") and ThyssenKrupp Elevator ("Thyssen") (concerning elevator entrances), and the New York City Housing Authority ("NYCHA") (concerning elevator cabs and entrances) – for a period of five years; (2) use National's confidential information and intellectual property to compete against National; (3) test or reverse engineer National's products; or (4) solicit National's employees for a period of three years.  (See Compl., Ex. A.) According to the unchallenged testimony of National's Chief Executive Officer, Harold

_____

        [4]  Andrew Metzger of AM Erectors had apparently worked on National's projects for approximately twelve to fifteen years.  (See Metzger Tr., 7/19/07, at 231.)

        [5]  Weninger resigned from H&B effective July 31, 2007.  (Weninger Tr., 7/19/07, at 81.)

Friedman, Fujitec occupied approximately fifty percent of the market for elevator entrances in the New York metropolitan area, and Thyssen occupied approximately ten percent of that market.  (H. Friedman Tr., 7/17/07, at 201-02.)

It is undisputed that Weninger signed this agreement on H&B's behalf at a meeting held in Minneapolis on October 21, 2005,[6] but that the parties never discussed the non-competition and non-solicitation provisions prior to signing.[7]  (See H. Friedman Tr., 7/17/07, at 215-16, 227-28.)  Once both parties had signed the Agreement, National's representatives disclosed various information to H&B – both verbally and in writing – including its business model and marketing strategies, its internal projections for anticipated sales and operating expenses, and materials concerning its pricing, outsourcing, gross margins,[8] and annual sales.  (See H. Friedman Tr., 7/16/07, at 164-70; J. Friedman Tr., 7/17/07 at 289-90; Trial Ex. 5.)  By e-mail dated October 25, 2005, Weninger acknowledged that the information National disclosed was covered by the parties' confidentiality agreement.  (See Trial Ex. 8; Weninger Tr., 7/19/07,

---

[6]  Weninger testified that she could not recall signing the Agreement, but she did not deny that her signature appears on it.  (See Weninger Tr., 7/16/07, at 67-68; see also H. Friedman Tr., 7/16/07, at 162-63 (testifying to having witnessed Weninger signing the Agreement)).

[7]  The evidence adduced at the preliminary injunction hearing showed that National e-mailed the Agreement to H&B on October 18, 2005.  On October 19, 2005, Weninger replied, "Thank you so much for the agreement.  Would you like to just sign it on Friday morning or would you like me to sign it and fax it?"  (Trial Exs. 2, 3)  The parties executed the agreement on Friday, October 21, 2005, when Harold and Jeffrey Friedman visited H&B's headquarters in Minneapolis.  (H. Friedman Tr., 7/16/07, at 162-63.)

[8]  Harold Friedman explained that the gross margin represents "the selling price less the cost of goods sold which includes the material costs, the labor costs and the indirect costs as they pertain to labor[.]"  (H. Friedman Tr., 7/16/07, at 174-75.)  He testified that gross margin information is kept confidential because a company's customers and competitors could use it to gain a competitive advantage.  (Id. at 177.)

at 110.)  Weninger also testified at the hearing that she did not possess most of this information prior to her meeting with National's representatives.  (Weninger Tr., 7/19/07, at 98-100.)

The acquisition did not come to pass, and there is no dispute that H&B went on to violate key provisions of the Agreement.  Specifically, H&B admits that it proceeded to conduct elevator entrance business with Fujitec beginning in December 2006, when Fujitec allowed its exclusive contract with National to expire and canceled purchase orders that it had already given to National.  It also admits that Weninger solicited National employees, including Rosemarie Griffenkranz, National's General Manager of Operations,[9] to work at H&B.  H&B does not deny that it signed the agreement, but argues that its terms are unenforceable as a matter of law.

On July 20, 2007, at the conclusion of the preliminary injunction hearing, I granted National's motion, with some modifications.  As it now stands, the following preliminary injunction is in place:

> H&B, its officers, agents, employees, servants, attorneys, and all entities or persons under H&B's control or in active concert or participation with H&B, shall be and hereby is preliminarily enjoined and restrained from:
>
> 1.  soliciting current employees of National until October 21, 2008;
>
> 2.  directly or indirectly using, soliciting, contacting, conducting business with, or dealing with the New York City Housing Authority concerning elevator entrances and elevator cabs until December 31, 2008;
>
> 3.  directly or indirectly using, soliciting, contacting, conducting business with, or dealing with ThyssenKrupp Elevator concerning elevator entrances in the New York Metropolitan Area, defined as the five boroughs of New York City, Westchester, Rockland,

_____

[9]  Griffenkranz continues to be employed by National.  She has since changed her last name to Cavale.

-5-

Nassau and Suffolk Counties, Northern New Jersey and Southern
Connecticut, until December 31, 2008;

4. directly or indirectly using, soliciting, contacting, conducting
business with, or dealing with Fujitec New York concerning
elevator entrances in the New York City Metropolitan Area until
December 31, 2008, except that H&B is specifically permitted to
perform the work and complete the projects listed in paragraphs 6
through 15 of the Certification of Kevin Lynch, dated July 5, 2007
(a copy of which is annexed hereto as Exhibit A)[10] and conduct
business with Fujitec New York necessary to complete those
projects;

5. using National's confidential and proprietary information,
including, but not limited to National's patented installation
methods, in violation of paragraphs 4 and 11(d) of the October 18,
2005 Letter Agreement; and

6. publicly disparaging National, its products or services in any
manner whatsoever.

H&B now seeks reconsideration of that decision, arguing that the court issued the preliminary

injunction "based upon an erroneous application of the law or upon findings for which there was

no factual support." (Memorandum of Law in Support of Defendant H&B, Inc.'s Motion to

Reconsider, dated Sept. 12, 2007 ("H&B Mem."), at 5.)

## DISCUSSION

A. <u>Reconsideration Standard</u>

As National correctly points out, a party seeking reconsideration typically must

demonstrate: (i) an intervening change of controlling law; (ii) the availability of new evidence;

or (iii) the need to correct a clear error or prevent manifest injustice. <u>Burrell v. United States</u>,

---

[10] These projects were in progress as of the date of the order. Lynch, Fujitec's Field
Operations Manager, testified about specific jobs that were pending as of the date of the hearing
and the problems Fujitec would encounter were H&B to be enjoined from completing those jobs.
(<u>See</u> Lynch Tr., 7/17/07, at 329-32.)

467 F.3d 160, 165 n.3 (2d Cir. 2006). Generally speaking, the standard on a motion for reconsideration is strict, as such a motion "is not to be used for 'relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple.'" Murray v. Palmer, No. 9:03-CV-1010, 2007 WL 1237679, at *2 (N.D.N.Y. Apr. 27, 2007) (quoting Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998)). In this case, in the interest of resolving the motion expeditiously and with the consent of the parties, I issued a decision at the conclusion of the hearing but set a schedule for briefing a motion for reconsideration, giving the parties sufficient time to review the hearing transcripts and conduct more extensive research and analysis. In doing so, I suggested that I would apply a more relaxed standard than would ordinarily apply on a motion for reconsideration. (See Tr., 7/20/07, at 3.) In light of my statements, I will consider the parties' arguments fully and will apply the standards normally applicable to a motion for a preliminary injunction.

B. Standard for Preliminary Injunction

To obtain a preliminary injunction in this circuit, the moving party has the burden of demonstrating: "(1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." Forest City Daly Housing, Inc. v. Town of N. Hempstead, 175 F.3d 144, 149 (2d Cir. 1999). See also Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 113-14 (2d Cir. 2006); Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp., 719 F.2d 42, 45 (2d Cir. 1983). A preliminary injunction is considered a "drastic" and "extraordinary" remedy that should not be granted routinely. Hanson Trust Plc. v. ML SCM

Acquisition, Inc., 781 F.2d 264, 273 (2d Cir. 1986) (preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies"); Medical Soc'y of the State of New York v. Toia, 560 F.2d 535, 538 (2d Cir. 1977) (preliminary injunction is "an extraordinary and drastic remedy which should not be routinely granted").  Whether injunctive relief should issue "'rests in the sound discretion of the district court.'"  Int'l Creative Mgmt., Inc. v. Abate, No. 07 Civ. 1979, 2007 WL 950092, at *2 (S.D.N.Y. Mar. 28, 2007) (quoting Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (quoting Thornburgh v. Am. Coll. of Obstetricians and Gynecologists, 476 U.S. 747, 755 (1986)).

      1.  Irreparable Harm

The Second Circuit has instructed that a showing of irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction."  Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir.1999) (internal quotation marks and citation omitted); accord Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990); Mamiya Co., 719 F.2d at 45.  The mere possibility of harm is not sufficient – the harm must be imminent and the movant must show "that it is *likely* to suffer irreparable harm if equitable relief is denied."  JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990) (emphasis in original) (citing In re Feit & Drexler, Inc., 760 F.2d 406, 415 (2d Cir. 1985)).  See also Rodriguez, 175 F.3d at 234 (preliminary injunction must be denied unless a movant can show "an injury that is neither remote nor speculative, but actual and imminent[.]"); Borey v. Nat'l Union Fire Ins. Co., 934 F.2d 30, 34 (2d Cir. 1991) (mere possibility of irreparable harm is insufficient); Reuters Ltd., 903 F.2d at 907 ("Irreparable harm must be shown by the moving party to be imminent, not remote or speculative"); Shapiro v. Cadman Towers, Inc., 844 F. Supp. 116, 122 (E.D.N.Y.

1994) (irreparable harm must be imminent, not remote or speculative), aff'd, 51 F.3d 328 (1995);

Computer Assocs. Int'l, Inc. v. Bryan, 784 F. Supp. 982, 986 (E.D.N.Y. 1992) (party applying

for preliminary injunctive relief must "establish more than a mere 'possibility' of irreparable

harm, namely 'that it is *likely* to suffer irreparable harm if equitable relief is denied.'") (quoting

JSG Trading Corp., 917 F.2d at 79)); Vera, Inc. v. Tug "Dakota", 769 F. Supp. 451, 454

(E.D.N.Y. 1991) (irreparable injury must be actual and imminent).

Moreover, a preliminary injunction will not lie if the movant can be adequately

compensated by money damages. Rodriguez, 175 F.3d at 234. See also Borey, 934 F.2d at 34

(monetary loss will not amount to irreparable harm unless movant provides evidence of damage

that cannot be rectified by financial compensation); Reuters Ltd., 903 F.2d at 907 (alleged injury

must "be one incapable of being fully remedied by monetary damages"); Loveridge v. Pendleton

Woolen Mills, Inc., 788 F.2d 914, 917-18 (2d Cir. 1986) ("where money damages are adequate

compensation, a preliminary injunction will not issue since equity should not intervene where

there is an adequate remedy at law.") (citing Triebwasser & Kutz v. Am. Tel. & Tel. Co., 535

F.2d 1356, 1359 (2d Cir. 1976)).

Courts have repeatedly held that when a party violates a non-compete clause, "the

resulting loss of client relationships and customer good will built up over the years constitutes

irreparable harm" and is appropriately protected by an injunction. Johnson Controls, Inc. v.

A.P.T. Critical Sys., Inc., 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004). See also Global Switching

Inc. v. Kasper, No. CV 06 412, 2006 WL 1800001, at *12 (E.D.N.Y. June 29, 2006) (explaining

that in cases involving a violation of a non-compete clause, "courts have often taken a somewhat

relaxed approach to the irreparable harm inquiry, and in certain circumstances have found it

appropriate to presume the existence of such an injury.") (citing <u>Innoviant Pharmacy, Inc. v.</u> <u>Morganstern</u>, 390 F. Supp. 2d 179, 188-89 (N.D.N.Y. 2005)).  This is because harm to a company's good will is not compensable.  <u>See</u> <u>Ivy Mar Co. v. C.R. Seasons, Ltd.</u>, 907 F. Supp. 547, 565 (E.D.N.Y. 1995) ("Numerous courts have held that harm to a company's operations, reputation, good will or customer relations is irreparable because money damages cannot provide adequate compensation for such injuries."); <u>Ecolab, Inc. v. Paolo</u>, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991) ("Loss of good will constitutes irreparable harm which cannot be compensated by money damages."); <u>Velo-Bind, Inc. v. Scheck</u>, 485 F. Supp. 102, 109 (S.D.N.Y. 1979) ("By siphoning off plaintiff's carefully gleaned customers, defendants subject plaintiff to a definite possibility of irreparable harm. . . .What is at stake here is plaintiff's good will built up over the years, which is not . . . monetarily ascertainable.").

Good will is not readily defined, but it has been described as the "expectation that the old customers will resort to the old place."  <u>United States v. All Assets of Statewide Auto Parts, Inc.</u>, 971 F.2d 896, 901 (2d Cir. 1992) (quoting <u>Commissioner v. Killian</u>, 314 F.2d 852, 855 (5th Cir. 1963), quoting <u>Crotwell v. Lye</u>, 34 Eng. Rep. 129, 134 (1810)).  It typically includes not only the likelihood that customers will return to the old place of business, but the competitive advantage of an established business.  <u>See</u> <u>Mutual Life Ins. Co. v. Menin</u>, 115 F.2d 975, 977 (2d Cir. 1940).  <u>See also</u> <u>Newark Morning Ledger Co. v. United States</u>, 507 U.S. 546, 555-56 (1993) ("Although the definition of goodwill has taken different forms over the years, the shorthand description of good-will as 'the expectancy of continued patronage,' provides a useful label with which to identify the total of all the imponderable qualities that attract customers to [a] business.") (internal citation omitted); <u>General Cigar Co., Inc. v. G.D.M. Inc.</u>, 988 F. Supp. 647,

659 (S.D.N.Y. 1997) ("Good will has been defined as 'the value attributable to a going concern apart from its physical assets – the intangible worth of buyer momentum emanating from the reputation and integrity earned by the company.'") (quoting <u>Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.</u>, 841 F. Supp. 1339, 1350 (E.D.N.Y. 1994)).  In other words, good will constitutes the intangible qualities of a business that attract customers (<u>see</u> H&B Mem. at 26), including the company's reputation in the market with respect to both current and potential customers.

In <u>Ticor Title Ins. Co. v. Cohen</u>, 173 F.3d 63, 69 (2d Cir. 1999), the Second Circuit upheld the district court's finding of irreparable harm, noting that "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."  The court in <u>Ticor</u> also emphasized that the employment contract at issue stated that the defendant's breach of the post-employment non-competition provision would cause irreparable injury; it held that such a clause "might arguably be viewed as an admission by [defendant] that plaintiff will suffer irreparable harm were [defendant] to breach the contract's non-compete provision."  <u>Id.</u>[11] Both of these factors are present here: (1) it would be difficult to calculate monetary damages that would redress the loss of National's long-term, ongoing relationships with its primary customers (assuming a finding of causation) and its potential relationships with future customers; and (2) in the Agreement, H&B expressly admitted that "money damages would not be a

---

[11]  I cite <u>Ticor</u> only for these general propositions and not to suggest that the instant case is factually analogous.

sufficient remedy for any breach."[12]  (Compl., Ex. A ¶ 12.)

However, the question is not whether the plaintiff has suffered irreparable harm, but whether it will be irreparably harmed *in the absence of an injunction*.  In other words, the injunction must prevent or remedy the harm.  In this case, at least with respect to the non-compete provision vis-a-vis Fujitec, H&B makes a credible argument that the preliminary injunction will not remedy the alleged harm.  As I noted at the hearing, Fujitec is not a party to this case, and an injunction preventing H&B from doing elevator entrance installation business with Fujitec would not, in all probability, benefit National directly.  Fujitec's General Manager for Construction Operations, Michael Donohue, testified that Fujitec would not continue to do business with National under any circumstances, even if it were unable to work with H&B.  (Donohue Tr., 7/18/07, at 461-62, 484-85.)[13]  With respect to the two other National customers

_____

[12]  I agree with H&B that this factor alone is not dispositive.  See Baker's Aid v. Hussman Foodservice Co., 830 F.2d 13, 16 (2d Cir. 1987) ("contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate.")  Nonetheless, this provision weighs in plaintiff's favor.  See Netherby Ltd. v. Jones Apparel Grp., Inc., No. 04 Civ. 7028, 2007 WL 1041648, at *20 (S.D.N.Y. Apr. 5, 2007) (citing Ticor, 173 F.3d at 69; Alpha Capital Aktiengesellschaft v. Advanced Viral Res. Corp., No. 02 Civ. 10237, 2003 WL 328302, at *5 (S.D.N.Y. Feb. 11, 2003)).

[13]  Donohue testified that Fujitec decided to seek an alternative supplier because it was dissatisfied with National's performance.  (See Donohue Tr., 7/18/07, at 442-44.)  Without expressly commenting on Donohue's credibility, I note that it appears to be more than coincidence that Fujitec, which had renewed its exclusive contract with National less than a year earlier, suddenly became unhappy with National at precisely the same time H&B was soliciting Fujitec, armed with National's confidential pricing information for Fujitec as well as National's elevator entrance design and methodology.  (See H. Friedman Tr., 7/16/07, at 172 (describing National's disclosure to H&B of its lowest prices for Fujitec)).  In fact, Donald Regina, Fujitec's President, testified that Fujitec decided to renew the exclusive agreement with National for 2006 because it was satisfied with National's performance at that time, and he never formally notified National that it had failed to comply with its agreement or that Fujitec was considering using a

(continued...)

-12-

mentioned in the Agreement – Thyssen and NYCHA – there is no evidence that either of those entities has awarded H&B any projects, despite H&B's efforts.[14]

Nevertheless, at the conclusion of the preliminary injunction hearing, I found that National had demonstrated that any further business between H&B and Fujitec (other than that permitted by the order), and any further solicitation of Thyssen and NYCHA by H&B, would likely harm National's good will because it would affect National's general reputation in the market. H&B argues that the court erred in finding the existence of irreparable injury based on damage to National's reputation because, according to H&B, "no evidence was submitted" to support this theory. (H&B Mem. at 5.)

To be sure, the instant case differs from cases involving the consummated sale of a company, since those cases are grounded on the premise that a buyer of a business should be permitted to restrict the seller's freedom of trade so as to prevent the seller from recapturing and using, by its competition, the good will of the very business that it transferred for value. See, e.g., Sovereign Business Forms v. Stenrite Indus., No. 00 CIV. 3867, 2000 WL 1772599 (S.D.N.Y. Nov. 28, 2000) (ordering permanent, five-year injunction precluding violation of non-

---

[13](...continued)
different entrance supplier. (See Regina Tr., 7/18/07, at 396, 401, 406; see also Donohue Tr., 7/18/07, at 531-32 (testifying that Fujitec first gave National a formal notice of default in March 2007 for two specific dates, March 12 and 20, 2007.) Nor did Fujitec – which ultimately received more advantageous pricing from H&B (see Donohue Tr., 7/18/07, at 536-37) – advise National that H&B was working with AM Erectors, although Donohue knew that H&B and AM Erectors were in discussions as early as May 2006. (See id. at 556-57.)

[14] The hearing testimony established that, although H&B has solicited Thyssen, it has not received any entrance business from that company. (Weninger Tr., 7/19/07, at 10, 112.) In addition, H&B filed an application to be qualified as a vendor on NYCHA projects, but there has been no action on that application. (Id. at 10, 57.)

compete, non-solicitation and non-disclosure provisions in contract for sale of business);

Manhattan Real Estate Equities Grp. v. Pine Equity Int'l, 801 N.Y.S.2d 236, 2004 WL 3267264

(Sup. Ct. Queens County 2004) (granting preliminary injunction on restrictive covenant of

"almost four years, limited to New York business activities"), aff'd, 791 N.Y.S.2d 418 (1st Dep't

2005). It also differs from cases involving franchise agreements, where courts are concerned

with preventing a defendant from capitalizing on the plaintiff's good will and reputation by

promoting a competing business after the defendant has ceased being a franchisee. See, e.g.,

RESCUECOM Corp. v. Mathews, No. 5:05-CV-1330, 2006 WL 1742073, at *4 (N.D.N.Y. June

20, 2006) (granting preliminary injunction and enforcing non-compete provisions against former

corporate franchisee); Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc., 834 F. Supp. 683, 693 (D.N.J.

1993) (explaining that if a franchisee is permitted to avoid its reasonable non-compete

obligations, not only the franchisor's good will but the franchise system itself is endangered). In

those types of cases, unlike here, there is a contractual transfer of good will, accompanied by

likely customer confusion between the competing businesses.[15]  Moreover, H&B is correct that

the mere loss of sales is not the same as loss of good will, since a loss of sales can be

compensated in money damages. See Baker's Aid v. Hussman Food Service Co., No. 87 CV

937, 1987 WL 10828, at *4 (E.D.N.Y. May 5, 1987).

Nonetheless, I find that National has shown that H&B's continued solicitation of

Fujitec, Thyssen and NYCHA, if not enjoined, will likely result in more than simply the

calculable loss of sales to National. Rather, such solicitation will create a "ripple effect,"

---

[15]  Neither the court nor the parties have uncovered a case with a factual scenario similar to the one in the instant matter.

causing ongoing, irreparable harm to National's standing with its customers and in the New York high-rise construction industry. Contrary to H&B's argument, this finding is not speculative, but is based on evidence adduced at the hearing, namely that:

(1) in October 2005, National was successful in the New York metropolitan market, while H&B had only a minimal presence in the market with respect to elevator cab sales and was seeking to enter the market with respect to entrances and installation services;

(2) from 2001 to 2006, National was Fujitec's exclusive entrance supplier and Fujitec was National's largest customer (see Certification of Marc D. Youngelson, Esq., dated July 11, 2007 ("Youngelson Cert."), Ex. 15; Donohue Tr., 7/18/07, at 441-42, 498 (describing Fujitec's exclusive agreement with National for supply and installation of standard elevator entrances, which was renewed annually);

(3) H&B knew that National was a leader in the New York market and had an exclusive relationship with Fujitec (see Deposition of Kimberly Ann Weninger, dated June 5, 2007 ("Weninger Dep."), at 78);

(4) H&B initiated the discussions with National concerning a potential acquisition (see H. Friedman Tr., 7/16/07, at 147);

(5) In connection with the parties' discussions, National disclosed materials it considered confidential, including its pricing and gross profit margins for Fujitec, described its exclusive installation methodology in detail, and identified AM Erectors as its primary installation supplier;

(6) H&B signed the agreement and, when the acquisition discussions ended, quickly breached the agreement by, among other things, aggressively pursuing Fujitec and

Thyssen for elevator entrance business and NYCHA for its entrance and cab business and by soliciting National employees to work at H&B;

(7) Fujitec allowed its exclusive agreement with National to expire, canceled purchase orders that had already been given to National, and immediately began awarding jobs to H&B, with the requirement that H&B install doors and frames from the floor, as National had done and as no other New York company, including H&B, had previously done. (See H. Friedman Tr., 7/16/07, at 143 ("Prior to 2007, no one else in the New York area provided this product. Only National did."), 186-90 (describing Fujitec's cancellation of purchase orders), 193 (testifying that, prior to its discussions with National, H&B did not have the technology to install entrances from the floor); J. Friedman Tr., 7/17/07, at 304 ("Up until the time we were told that H&B's entrances were being installed from the floor, that was the first time we had ever heard of anybody else's entrances being completely installed from the floor"); Regina Tr., 7/18/07, at 412 (testifying that in 2006 Fujitec canceled purchase orders that had previously been issued to National and later gave those jobs to H&B);

(8) H&B considered Fujitec a "strategic account" in the New York City high-rise elevator market (Weninger Tr., 7/19/07, at 126; see also Weninger Dep. at 85);

(9) During this time, H&B – which had never before offered installation services[16] – hired all of the installers who had previously worked for AM Erectors (see Weninger Tr., 7/19/07, at 132) and agreed to pay Andrew Metzger, the head of AM Erectors, approximately

---

[16] See J. Friedman Tr., 7/17/07, at 290 ("[W]e talked about the strategy of selling installation as a vital component of succeeding in the New York marketplace, something that was not done outside of New York to the best of our knowledge, and the benefits that had. And again for somebody that was not used to providing installation service as H&B said they were not, that's [] very critical information.")

$300,000 per year to work as a consultant for H&B (see Metzger Tr., 7/19/07, at 198); National received one day's notice that AM Erectors would no longer provide installation services on National's jobs. (H. Friedman Tr. at 264-66);

(10) When Michael Donohue of Fujitec learned about the non-compete provisions in the Agreement between National and H&B, he spoke with Weninger, who denied signing the Agreement and suggested that it was a forgery. (See Donohue Tr., 7/18/07, at 530; see also Deposition of Donald Regina, dated June 25, 2007, at 235.)

In other words, National and H&B compete for the same business in the same limited marketplace, where National has established long-term relationships with important customers in the industry and H&B is a new entrant. Through the Agreement, H&B gained access to information about National that it would not otherwise have – including National's entrance design, marketing plan, outsourcing and pricing information[17] – which showed H&B how it could be profitable on entrances in the New York market. Although it expressly agreed to all of the terms of the Agreement, H&B reneged, proceeded to engage in a campaign of aggressive and underhanded tactics,[18] and immediately lured away National's largest customer as

---

[17] As Harold Friedman explained, pricing information is kept confidential in this industry because "[i]t can be backward engineered" and "used to harm [a] company if someone else would have it." (H. Friedman Tr., 7/16/07, at 173.) He further explained that customers such as Fujitec carefully guard their pricing information because "[t]hey don't want their competitors to know what their cost bas[e]s are." (Id.) Jeffrey Friedman also testified about the confidential nature of pricing information. He explained: "[W]e gave them the price we were selling these entrances for. Again, that's something you would never share with a competitor because it allows them to undercut you or allows them to raise their prices to where they can become more profitable on a product." (J. Friedman Tr., 7/17/07, at 289.)

[18] H&B exhibited this predatory approach in an e-mail from Richard Caraballo of H&B to Ken Ducalo, an H&B salesperson, and Kimberly Weninger, stating that H&B wanted to "steal
(continued...)

well as its entrance installer, who abandoned National on one day's notice.  With that backdrop,

one can easily conclude that H&B can and will cause irreparable, unquantifiable harm to

National's customer relations and reputation in the industry if it is not enjoined.[19]

---

[18](...continued)
more National work."  (Trial Ex. 36; Youngelson Cert., Ex 46.)

[19]  When asked how National had been harmed by H&B's actions, Harold Friedman
testified:

> Our goodwill and reputation has been called into question in this
> marketplace.  We are accused of being a forger, a liar, but that's
> the tip of the iceberg.
>
> The real hurt is that over 40 years I never failed to finish a job.
> That's why I got all those big jobs.  That's why I got the Empire
> State Building, the World Trade Center.  That's why I could deal
> with the best and brightest in town.   I never failed to finish a job.
> I was a fair trader.  In the last year I've been accused of fraud.  I
> had one day's notice by AM Erectors, a guy I would lend money to
> when he was in trouble and take no interest. . . . And so I had no
> erectors.  I had nobody to install.  I couldn't open the building in
> that area on that day with one days notice and book full of work.  I
> fell behind with other customers.  It cost us a ton of money to train
> other people. . . . [B]usiness is down 75 percent right now.

He further testified:

> You are as good as your last job in the business.  You carry a
> reputation. . . . It's a very tight community.  When a company
> doesn't finish their jobs or is replaced on the job, I got canceled
> jobs.  My drawings were out with those people.   What happened
> with National?  Oh, he is not a fair guy, someone else replaced
> him.  How do I know that that doesn't show up on an existing
> building where he doesn't want me to do the elevator cabs?
>
> Bad news.  I've never been known for that.  I've never been
> thought of that way and I – it's a terrible, terrible shock and it's a
> terrible, terrible thing. . . Our company has been egregiously hurt
> in many financial ways, in reputation, in goodwill, . . . personally.

(continued...)

Moreover, although H&B has not yet been successful in attracting business from Thyssen and NYCHA, National need not wait until its relationships with Thyssen and NYCHA are damaged before seeking an injunction.  See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn, 73 F. Supp. 2d 425, 428-29 (S.D.N.Y. 1999) (former employees' attempted solicitation of customers to go to a competitor was sufficient to justify preliminary injunction); Hay Grp., Inc. v. Nadel, 566 N.Y.S.2d 616, 617 (1st Dep't 1991) (finding irreparable harm and granting preliminary injunction with respect to restrictive covenant in sale of business transaction without a showing of actual loss of customers).  Based on the course of events with Fujitec, H&B's attempt to solicit Thyssen and NYCHA is sufficient to establish a likelihood of irreparable harm in this context.

2.    Likelihood of Success on the Merits

At the conclusion of the hearing, I also found that National was likely to succeed on the merits of its claims.  To satisfy its burden of showing likelihood of success on the merits, the movant "need not show that success is an absolute certainty.  It need only be shown that the probability of the movant prevailing is better than fifty percent."  Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985).  See also Computer Assocs. Int'l, Inc. v. Bryan, 784 F. Supp. 982, 986 (E.D.N.Y. 1992).

Under New York law,[20] the enforceability of a restrictive covenant depends in

---

[19](...continued)
(H. Friedman Tr., 7/17/07, at 194-97.)  I find this testimony credible and convincing.


[20]  The Agreement states that it "shall be governed by and construed in accordance with
(continued...)

part on the nature of the underlying contract.  See Kasper, 2006 WL 1800001, at *15.  In

Purchasing Assocs. v. Weitz, 196 N.E.2d 245 (N.Y. 1963), the New York Court of Appeals

observed that in earlier years restrictive covenants were not enforceable because they were

viewed as acting in restraint of trade.  More recently, however, courts have held that there are

situations where it is not only desirable but essential to enforce restrictive covenants.  For

instance, a restrictive covenant is enforceable in a contract for the sale of a business involving

the transfer of good will as a going concern.  196 N.E.2d at 247.  As the court observed in

Baker's Aid v. Hussman Foodservice Co., 730 F. Supp. 1209, 1214 (E.D.N.Y. 1990),

"*reasonable* restrictive covenants ancillary to the sale of a business are routinely enforced to

protect the good will paid for by the purchaser."  (citing Chevron U.S.A., Inc. v. Roxen Serv.,

Inc., 813 F.2d 26, 28 (2d Cir. 1987) (emphasis added)).  Of course, no sale of a business was

completed in this case; however, similar concerns apply here, since the parties were attempting

to negotiate an acquisition and it is clear that National would not have agreed to share its

information with H&B without the ability to prevent H&B from using that information to

National's disadvantage.[21]

---

[20](...continued)
the laws of the State of New York.  (Youngelson Cert., Ex.19, ¶ 15.)

[21]  Restrictive covenants in employment agreements receive very different treatment. As
explained in Baker's Aid, "[b]ecause enforcement of employee restrictive covenants may result
in the loss of an individual's livelihood, such covenants are 'rigorously examined' and enforced
only to protect an employer from unfair competition stemming from – among other things – the
disclosure of trade secrets."  730 F. Supp. at 1214 (citing and quoting Am. Inst. of Chem.
Engineers v. Reber-Friel Co., 682 F.2d 382, 387 (2d Cir. 1982)).  See also Columbia Ribbon &
Carbon Mfg. Co., Inc. v. A-1-A Corp., 369 N.E.2d 4, 6 (N.Y. 1977) (since there are "powerful
considerations of public policy which militate against sanctioning the loss of a man's
livelihood," restrictive covenants that tend to prevent an employee from pursuing a similar

(continued...)

(a) <u>Non-Compete and Non-Solicitation Provisions</u>

In order to demonstrate a likelihood of success on the merits on its non-compete and non-solicitation claims, plaintiff must show that the restrictive covenants contained in the Agreement are enforceable. As I explained at the hearing, in order for a non-compete covenant between two business to be enforced, "it must pass a reasonableness test." <u>ServiceMaster Residential/Commercial Servs., L.P. v. Westchester Cleaning Servs., Inc.</u>, No. 01 Civ. 22, 2001 WL 396520, at *3 (S.D.N.Y. Apr. 19, 2001). New York courts will enforce a non-compete clause between business entities "only where it protects a legitimate business interest and where its terms are reasonable both in time and geographic scope." <u>Id.</u> (citing <u>DAR & Assocs. v. Uniforce Servs., Inc.</u>, 37 F. Supp. 2d 192, 196-98 (E.D.N.Y. 1999); <u>Carvel Corp. v. Eisenberg</u>, 692 F. Supp. 182, 185-86 (S.D.N.Y. 1988)).[22]

_____

[21](...continued)
vocation after termination of employment are disfavored and will be enforced only if reasonably limited temporarily and geographically, and then only to the extent necessary to protect the employer from unfair competition stemming from the employee's use or disclosure of trade secrets or confidential customer lists. (citations omitted)). In this case, there is no concern regarding the possible loss of an individual's livelihood. Nor is there an imbalance of bargaining power – such as that between an employer and employee – that would implicate New York's public policy disfavoring restrictive covenants. The parties to this agreement are both sophisticated business entities, capable of understanding the terms and implications of this Agreement and making an informed decision as to its risks and benefits. The cases defendant has cited concerning non-solicitation or non-compete covenants in the employment context are therefore of little value here.

[22] In its initial Memorandum of Law, H&B argued that the court erred in failing to apply the "rule of reason" analysis employed by some federal courts analyzing restrictive covenants. (<u>See</u> H&B Mem. at 13-16; <u>see also</u> <u>Baker's Aid</u>, 730 F. Supp. at 1214, 1216 (explaining that, in addition to cases involving the sale of a business or an employment contract, "there is, in fact, at least a third strain of cases dealing with covenants not to compete that are made as a part of an ordinary commercial contract. These latter covenants are analyzed under a simple rule of reason"
(continued...)

H&B argues that the Agreement's non-compete covenant is unreasonable because it excludes H&B from competing for approximately sixty percent of the elevator entrance business in the New York metropolitan area and therefore will have "a substantial anti-competitive effect on the elevator entrance market segment." (H&B Mem. at 2.) It contends that the court erred by failing "to take into account the substantial impact of the anti-competitive covenant on the market" and by failing "to analyze whether the non-competition covenant was necessary to protect National from the possible misuse of the confidential information by H&B." (Id. at 5.)

I find that National is likely to succeed in proving that the non-compete clauses of the agreement – as modified by the court[23] – are sensible in temporal and geographic scope and do not impose an unreasonable restraint on competition. To be sure, the non-compete covenant covers a large segment of the New York City market for the installation of elevator entrances and cabs. It does not, however, prevent H&B from conducting business anywhere else in the world or with any customers other than the three listed in the agreement. It is undisputed that

---

[22](...continued)
which requires, among other things, that the court weigh "'all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.'" (quoting Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977).). In its reply brief, however, H&B concedes that the "rule of reason" analysis is "functionally equivalent" to the New York reasonableness test this court applied. (See Memorandum of Law in Further Support of Defendant H&B Elevator, Inc.'s Motion to Reconsider, dated Nov. 30, 2007, at 2.) H&B's arguments concerning the reasonableness of the restrictive covenants are addressed below.

[23] The Agreement itself contained no geographic limitations, but simply prohibited H&B from transacting certain business with three specific entities in whatever areas they serve. The court limited the preliminary injunction to "the New York Metropolitan Area, defined as the five boroughs of New York City, Westchester, Rockland, Nassau and Suffolk Counties, Northern New Jersey and Southern Connecticut."

there are other important customers in this market, including Schindler, Otis, Transel, and Kone. (See Tr. 7/16/07 at 38, 56, 90.) H&B may even continue to solicit Fujitec and Thyssen with respect to elevator cabs.[24]

Baker's Aid, 730 F. Supp. 1209, on which H&B relies, is distinguishable. In that case, the non-compete covenant prevented competition for a period of ten years nationwide and in Canada. The restrictive covenant in this case, by contrast, applies only to three identified customers in one market. The two situations are not comparable, as the covenant in the instant case is much more narrowly tailored.[25]

I also find that National is likely to succeed in proving that the non-compete provisions served the legitimate interests of both parties at the time the agreement was signed. H&B argues that the primary purpose of this agreement was "to prevent the misuse of [National's] proprietary information" and that the non-compete provisions are not reasonably related to that purpose. (H&B Mem. at 17.) I agree that the principal purpose of the agreement was for National to be able to disclose materials it considered confidential without the risk of H&B using that information to gain a competitive advantage if the acquisition did not come to

_____

[24] In fact, Weninger testified that H&B is currently selling cabs to Thyssen. (Weninger Tr., 7/19/07, at 10.)

[25] The plaintiff in Baker's Aid, an oven distributor, had contracted with the defendant, an oven manufacturer, to develop plans and specifications for a rack oven, which the defendant then manufactured pursuant to the agreement. As a condition of going forward with that arrangement, the parties entered into a set of restrictive covenants, including one barring the defendant from using the plaintiff's proprietary information and one barring the defendant from selling rack ovens in the United States and Canada for a ten year period. The court concluded that the non-compete covenant was unenforceable because it was overbroad and not reasonably necessary to prevent the disclosure of the plaintiff's proprietary information or the misuse of the plaintiff's plans and specifications.

pass, and I find that the non-compete provisions were designed to serve that purpose. H&B

clearly benefitted from this arrangement in that it gained access to information about National

and its product that would otherwise have been unavailable to it. Although H&B insists that

much of the information National disclosed was publicly available or was common knowledge in

the industry, the evidence adduced at the hearing showed that the information went well beyond

that which could have been compiled from public sources. National reasonably believed that

merely restricting use of the information by H&B would have been insufficient to protect its

legitimate interests. Once knowledge is learned, it cannot be "unlearned."

Indeed, National's fears were borne out, as its long-term exclusive relationship

with Fujitec ended very soon after the acquisition discussions fell through, and H&B has stepped

into its shoes, apparently using the techniques and business methods National had developed

over the course of many years. Under the circumstances, National had a valid concern that it

needed to prevent H&B from soliciting its three most important customers as a way of protecting

against the misuse of its information, and H&B agreed that the exchange was fair and

equitable.[26]

----

[26] H&B makes much of the fact that the parties did not specifically discuss or negotiate
the non-compete provisions prior to signing the Agreement, and it argues that National "should
have brought these additional terms to H&B's attention." (H&B Reply Mem. at 10 n. 8.) I am
not persuaded that the lack of substantive discussion carries any weight in this analysis. H&B
had ample opportunity to read the Agreement and confer with counsel. It does not contend that
it was under any duress or that National made any misrepresentations concerning the contents or
significance of those provisions. Indeed, Weninger never indicated that she had any objections
to the Agreement. (H. Friedman Tr., 7/16/07, at 161.) Under the circumstances, National had
every reason to believe that H&B raised no concerns because it found the Agreement
satisfactory. Whether or not Weninger actually read the Agreement before signing it is neither
here nor there, since one who signs a contract is bound by its terms. See Generale Bank v.
Wassel, 779 F. Supp. 310, 315 (S.D.N.Y. 1991); Marine Midland Bank v. Embassy East, 553

(continued...)

The instant motion compels the court to weigh the policy of promoting free trade against that of enforcing an arms-length agreement between sophisticated business entities. Based on the testimony and other evidence adduced at the hearing and in the parties' submissions, I am not convinced that enforcing the non-compete provisions will violate the Sherman Act or otherwise pose an unlawful or unreasonable restraint on trade. Fujitec, which comprises approximately fifty percent of the relevant market, is not obliged to retain National on future jobs. It is free to contract with other elevator entrance suppliers, such as EDI, Global, Van Dam, and Gunderland.[27] (See Tr., 7/16/07, at 90.) All restrictive covenants, by their nature, have some anti-competitive effects. The question is whether the impact on trade is unreasonable or is outweighed by other concerns. In the instant case, I find the anti-competitive effects small in comparison to the harm National will face if the covenants are not enforced. This case is wholly distinguishable from cases involving market allocation between competitors; the Agreement was not designed to allocate market shares but to protect National from the unfair use of its confidential business information, and in fact it does not ensure any market share for National. In sum, National is likely to succeed in proving that the non-compete covenants are reasonable.

H&B's briefs make no mention of the provisions in the preliminary injunction prohibiting solicitation of National's employees. Presumably, it has no objection to the

---

[26](...continued)
N.Y.S.2d 767, 769 (1st Dep't 1991).

[27] Apparently, these companies supply elevator entrances but do not provide installation services. Nonetheless, Fujitec could hire a separate company to do installations. (See Lynch Tr., 7/17/07, at 356; Donohue Tr., 7/18/07, at 494-95.)

employee non-solicitation component of the preliminary injunction.

      (b) <u>Confidentiality Provisions</u>

At the close of the hearing, I also found that National has a reasonable likelihood of success in proving that the Agreement's trade-secret and confidentiality provisions are enforceable. Under New York law, a trade secret is "'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" <u>N. Atlantic Instruments v. Haber</u>, 188 F.3d 38, 44 (2d Cir. 1999) (alteration in original) (quoting <u>Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.</u>, 118 F.3d 955, 968 (2d Cir. 1997)). In determining whether information constitutes a trade secret, New York courts consider the following factors:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

<u>Abate</u>, 2007 WL 950092, at *4 (citing <u>N. Atlantic Instruments</u>, 188 F.3d at 44). Simply labeling information "confidential" in an agreement does not render that information protectable. <u>See, e.g.</u>, <u>AM Medica Commc'ns Grp. v. Kilgallen</u>, 261 F. Supp. 2d 258, 262 (S.D.N.Y. 2003).

In my decision, I found that National has a reasonable likelihood of success in proving that at least some of the information National disclosed to H&B during their acquisition discussions constituted trade secrets.[28] For example, National gave H&B a DVD describing its

---

[28] As H&B correctly notes, the preliminary injunction entered on July 20, 2007 makes no
(continued...)

patented[29] SecureSlide entrances, which could be installed entirely from the floor in the hallway.

When the discussions ended, National demanded that H&B return the DVD, along with all of the

other materials National had provided in connection with the parties' discussions, including its

business model and information concerning its pricing, gross margins, and annual sales.  I found

that National demonstrated that it carefully guarded the design and processes described in the

DVD, and as a result, the DVD likely contained confidential or proprietary information.[30]  H&B

argues that this finding was insufficient, and that the court erred in finding that any information

National disclosed constituted a trade secret and in failing to find "that evaluation material

provided under the Letter Agreement was misused."  (H&B Mem. at 5.)  H&B also points out

that some of the information National disclosed was publicly available at the time.  (Id. at 19.)

On the issue of misuse, National presented no evidence that H&B's basic

---

[28](...continued)
reference to "trade secrets," but only enjoins H&B from using National's "confidential and
proprietary information, including, but not limited to National's patented installation methods."
It was therefore unnecessary for the court to find specifically that National is likely to prove that
H&B misappropriated "trade secrets."  Regardless of the label applied to the disclosed
information, I find that National has met its burden of demonstrating that the information was
not publicly available, was carefully guarded by National, was valuable to National's
competitors, and would not have been available to H&B were it not disclosed pursuant to a
confidentiality agreement.

[29]  The parties agreed to remove any patent issues from the expedited discovery and
preliminary injunction hearing.  (See Tr., 7/16/07, at 72; 7/20/07, at 64-68.)  Therefore, I have
made no findings with respect to this patent.  The preliminary injunction makes reference to
National's "confidential and proprietary information, including, but not limited to National's
patented installation methods."  That language was intended to track the language of the
Agreement and was inserted for purposes of clarity, with the consent of H&B's counsel.  (See
Tr., 7/20/07, at 69-71.)   In light of that consent, I decline to remove the reference to "patented
installation methods" at this time.

[30]  Later, in November 2006, National posted the DVD on its website.  (See J. Friedman
Tr., 7/17/07 at 298.)  For purposes of this motion, National does not argue that the information in
the DVD remains proprietary.

business model changed after it gained access to the materials National designated as confidential. On the other hand, Weninger admitted that after she returned the SecureSlide DVD to National, she asked Kone, a customer of both H&B and National, for a copy of the DVD. (See Youngelson Cert., Ex. 49; Weninger Tr., 7/19/07, at 105.)[31] Clearly, then, the DVD contained information that H&B deemed valuable and that was not publicly available at the time. As Jeffrey Friedman credibly testified: "In terms of the product itself, obviously, I feel we gave methodology of our installation, things we did not believe they had before, based on Weninger's statements, things they could use to improve the design of their entrance, if they so wished." (J. Friedman Tr. at 289.) Indeed, Fujitec specified in its contract with H&B that entrances had to be installed from the floor. (Deposition of Michael Donohue, dated June 26, 2007, at 55.) Based on these unrefuted facts, the court may infer that H&B misappropriated National's proprietary information and used it to compete against National. See Q-CO Indus., Inc. v. Hoffman, 625 F. Supp. 608, 618 (S.D.N.Y. 1985) (explaining that because "'misappropriation and misuse can rarely be proved by convincing direct evidence,'" plaintiffs must often "'construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences[.]'") (quoting Greenberg v. Croydon Plastics Co., 378 F. Supp. 806, 814 (E.D. Pa. 1974)).

Weninger's protestations to the contrary are unpersuasive, since her memory of the events at issue was selective at best and her responses were often evasive or imprecise. In

---

[31] In an e-mail, Weninger asked Kone to send her the DVD as a "favor" because she wanted "one of [H&B's] engineers to look at it." (Youngelson Cert., Ex. 49.) Harold Friedman testified that, prior to that time, National had never provided the DVD to anyone, including Kone, without a confidentiality agreement. (See H. Friedman Tr., 7/16/06, at 144, 193-94; see also J. Friedman Tr., 7/17/07, at 288-89.)

addition, her testimony is belied by the evidence demonstrating that, almost immediately after receiving confidential materials from National and meeting with National's representatives, H&B, which had not made a profit on entrances for many years and had little presence in the New York City market, began offering installation, changed its design,[32] and suddenly had the ability to attract Fujitec as a customer. This court is hard-pressed to believe that the timing of H&B's success is a coincidence and that H&B made no use of National's confidential information.

## CONCLUSION

For the reasons stated above, defendant H&B's motion for reconsideration is denied.

SO ORDERED.

Dated: Brooklyn, New York
January 24, 2008

_____/s/_____
ROBERT M. LEVY
United States Magistrate Judge

---

[32] See Weninger Tr., 7/19/07, at 132 ("It is true that . . . we changed our design.").